IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

Case No.

THE STATE OF FLORIDA and CHARLES H.
BRONSON, Florida Commissioner of Agriculture,

      Plaintiffs,

v.

LISA P. JACKSON, as Administrator of the United States
Environmental Protection Agency; and THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY,

      Defendants.

_____/

## COMPLAINT

THE STATE OF FLORIDA and CHARLES H. BRONSON, Florida Commissioner
of Agriculture, sue the U.S. ENVIRONMENTAL PROTECTION AGENCY (EPA) and its
Administrator, LISA JACKSON, acting in her official capacity, and assert:

## JURISDICTION AND VENUE

1.     This is an action for declaratory and injunctive relief brought pursuant to the federal
Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706.  The court has jurisdiction under 28
USC § 1331.

2.     The Pensacola Division of the U. S. District Court, Northern District of Florida, located
in Pensacola, Escambia County, Florida is an appropriate venue.

## THE PARTIES

3.      Plaintiff is the sovereign State of Florida.  Control of nutrient loading from predominately non-point sources involves traditional States' rights and responsibilities for water and land resource management which Congress expressly intended to preserve in the Clean Water Act, 33 U.S.C. §1251(b) & (g).  EPA's usurpation of the responsibility for nutrient criteria violates the premise of cooperative federalism which Congress intended to be the underpinning of the CWA. EPA's actions here are inconsistent with the federal-state balance that Congress so carefully struck in creating the CWA.  Florida has embarked on an ambitious Total Maximum Daily Load (TMDL) program and has been working diligently to maintain compliance with the CWA through a program designed to adopt TMDL's for impaired waterways and numeric nutrient criteria where possible.  These model programs have improved the quality of Florida's waters. These sovereign interests give Florida standing to challenge the arbitrary and capricious interference by EPA in Florida's ongoing successful *EPA approved* nutrient pollution abatement programs.

4.      Plaintiff, the Florida Commissioner of Agriculture,Charles H. Bronson, supervises all matters pertaining to agriculture in the State of Florida, pursuant to Article IV, Section 4(f), of the Florida Constitution, except as otherwise provided by law.  The Commissioner of Agriculture is also the head of the Florida Department of Agriculture and Consumer Services under Section 20.14(1) Florida Statutes, and is statutorily charged with the duty to "protect the agricultural and horticultural interests of the state" under Section 570.07(13), Florida Statutes.  The Florida legislature has declared in Section 604.001(2) & (5), Florida Statutes that "[t]he production of agricultural commodities in this state is a large and basic industry that is important to the health and welfare of the people and to the economy of the state" [and] "that additional problems are

not created for growers and ranchers engaged in the Florida agricultural industry by laws and regulations that cause, or tend to cause, agricultural production to become inefficient or unprofitable." Under Sections 570.074 and 570.085, Florida Statutes, the Commissioner has created and oversees an office of water coordination for the purpose of engaging in any matter "relating to water policy affecting agriculture, application of such policies, and coordination of such matters with state and federal agencies."

The Department of Agriculture and Consumer Services has a statutory duty, pursuant to section 403.067, Florida Statutes, to adopt by rule Best Management Practices that ensure that agricultural impacts on impaired waters meet the requirements of the TMDLs that are adopted by the state and approved by EPA. The arbitrary and capricious nature of the EPA rule will affect this regulatory responsibility. Therefore the Commissioner has standing to challenge EPA's Rule.

5.     Defendant EPA is the principal federal agency responsible for implementing the Clean Water Act (CWA). EPA has oversight authority as to the Florida National Pollutant Discharge Elimination System (NPDES) Permit Program, Water Quality Standards Program, and TMDL Program.

6.     Defendant Lisa Jackson is the current Administrator of the EPA. Administrator Jackson is named in this action in her official capacity only.

### ALLEGATIONS APPLICABLE TO ALL COUNTS

7.     On July 17, 2008, a citizen's suit was filed against EPA and former EPA Administrator Stephen Johnson alleging that the Administrator had failed to exercise a nondiscretionary duty to promulgate numeric nutrient criteria for surface waters within the State of Florida because the State had allegedly failed to do so. The suit was filed in the U. S. District Court, Northern

District of Florida.  *Florida Wildlife Federation, Inc., Sierra Club, Inc., Conservancy of Southwest Florida, Inc., Environmental Confederation of Southwest Florida, Inc., and the St. Johns Riverkeeper, Inc. v. Johnson*, Case No.: 4:08-cv-00324-RH-WCS.

8.      The plaintiffs in the citizen's suit asserted that a non-discretionary duty to adopt numeric nutrient criteria for Florida was triggered by publication of EPA's 1998 *Clean Water Action Plan,* which EPA co-authored with the U. S. Department of Agriculture.  Section 303(c)(4) of the Clean Water Act states in relevant part:

> (4) <u>The Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved</u>
>
> (A) if a revised or new water quality standard submitted by such State under paragraph (3) of this subsection for such waters is determined by the Administrator not to be consistent with the applicable requirements of this Act, or
>
> (B) <u>in any case where the Administrator *determines* that a revised or new standard is *necessary* to meet the requirements of this Act</u>. The Administrator shall promulgate any revised or new standard under this paragraph not later than ninety days after he publishes such proposed standards, unless prior to such promulgation, such State has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this Act.  (Emphasis added).

The plaintiffs in the citizen's suit asserted that EPA's 1998 *Clean Water Action Plan* was a formal determination by the Administrator, under Section 303(c)(4)(B), that numeric nutrient criteria are necessary for Florida surface waters for the State of Florida to remain in compliance with the Clean Water Act.

9.      EPA initially defended the suit and contested the argument that the 1998 document was a formal necessity determination under the Clean Water Act.  By letter dated September 28, 2007, EPA had recently approved the State of Florida's revised *Numeric Nutrient Criteria Development Plan* which included a timetable through 2011. ***Exhibit 1.***

**The January 14, 2009 "Necessity Determination"**

10.     On January 14, 2009, EPA released a letter from Benjamin H. Grumbles, former Assistant Administrator of EPA, to Michael Sole, (then) Secretary of the Florida Department of Environmental Protection (DEP), which stated: "This letter constitutes a determination under the Clean Water Act (CWA) section 303(c)(4)(B) that new or revised water quality standards for nutrients are necessary to meet the requirements of the CWA for the State of Florida." *Exhibit 2*.

11.     EPA documents from December, 2008 reveal that the January 14, 2009, necessity determination was not prepared in conjunction with a reasoned analysis of scientific issues and environmental policy, but rather as part of a strategy either to induce settlement of the August, 2008 citizen's suit or to support a motion to dismiss that suit.

12.      In late December 2008, (then) EPA Assistant Administrator Luis Luna provided a memorandum to (then) EPA Administrator Stephen Johnson requesting that the Administrator grant Assistant EPA Administrator Benjamin Grumbles a one-time delegation to sign a necessity determination for the State of Florida. *Exhibit 3*. Mr. Luna stated:

> EPA does not agree with the plaintiffs' allegation that we made a CWA determination in our 1998 Strategy[1] that numeric nutrient criteria are necessary for Florida to meet the requirements of the CWA. <u>There is, however, some risk that the court could agree with the plaintiffs that the 1998 Strategy constitutes a CWA determination that nutrient criteria are necessary for Florida. Such a ruling could spur similar litigation in other states.</u> Presently, 49 states have one or more 303(d) listings for waters impaired by nutrients. (Emphasis added).

> The litigants have highlighted that water quality in Florida is declining due to nutrient pollution and that numeric criteria are needed to address the environmental degradation.

---

[1] Plaintiffs initially alleged that EPA's 1998 *National Strategy for the Development of Regional Nutrient Criteria* was the document serving as a necessity determination. In their first amended complaint, the plaintiffs alleged that it was the 1998 *Clean Water Action Plan*, coauthored with the U. S. Department of Agriculture, that was the document triggering EPA's mandatory duty to promulgate numeric nutrient criteria for Florida.

> In response to this lawsuit, we believe that we should collect and analyze nutrients-related information pertaining to Florida and decide whether to make a Section 303(c)(4)(B) determination that revised nutrient standards are necessary for the State of Florida to meet the requirements of the CWA.  Making such a determination could give EPA a basis to propose a settlement to the plaintiffs or to request that the court dismiss the case. While making a determination may not resolve the litigation, we believe it is an option we should seriously consider and therefore are requesting delegation of authority.  A CWA Section 303(c)(4)(B) can only be made by the Administrator or the Administrator's duly authorized delegate.  (Emphasis added).

Administrator Johnson approved Mr. Luna's memorandum and signed the delegation on Monday, December 29, 2008.

13.     With weekends and federal holidays excluded, Mr. Grumbles—who did not heretofore have the authority to make a necessity determination applicable to Florida—had only 11 working days, between December 29, 2008 and January 14, 2009, to make such a determination. Contrary to Mr. Luna's suggestion that the agency "collect and analyze nutrients- related information pertaining to Florida" in order to justify a necessity determination, EPA released the January 14, 2009 letter.  There is no record that would justify EPA taking such a sudden change in position.

14.     EPA did not "collect and analyze nutrient related information pertaining to Florida" (*see* Luna memorandum, paragraph 11 of this Complaint and Exhibit 3), but in lieu thereof referenced existing information regarding Florida water quality in the letter prepared for Assistant Administrator Grumbles' signature.

15.     EPA's January 14, 2009 necessity determination also failed to abide by the public participation and public consultation requirements in 40 C.F.R. 25.4(c) and (d), which are applicable to the January 14, 2009 determination pursuant to 40 C.F.R. 25(a)(2) and (5).

16.     The January 14, 2009 necessity determination was not the product of careful deliberation but a legal maneuver to quash the debate over the 1998 *Clean Water Action Plan* and limit any nationwide precedential effect of the suit filed in Florida.

17.     A privilege log provided by EPA in response to a request for documents filed under the federal Freedom of Information Act (FOIA) revealed that EPA was preparing a press release related to the January 14, 2009 necessity determination on the same day of, or prior to, Administrator Johnson having delegated the one-time authority to Assistant Administrator Grumbles to sign the determination indicating that a decision had been made to issue the necessity determination prior to the delegation or any collection or analysis of nutrient information related to Florida.

18.     A deliberative marshalling of conclusive evidence is a necessary component of the Administrator's necessity determination under § 303(c)(4)(B) of the Clean Water Act.  *See* 57 Fed. Reg. 60848, 60858 ("In normal circumstances, it might be argued that to exercise section 303(c)(4)(B) the Administrator might have the burden of marshalling conclusive evidence of 'necessity' for Federally promulgated water quality standards").[2]  In the instant case, EPA was faced with "normal circumstances" but failed to marshal any evidence, much less conclusive evidence, that *federal* numeric nutrient criteria are necessary for Florida waters.

19.     The January 14, 2009 necessity determination is a condition precedent to and an integral part of the rulemaking procedure leading up to the promulgation of the challenged rules.

---

[2]  In explaining why the Administrator did not engage in the "normal" process of "marshaling conclusive evidence of necessity" for promulgating federal water quality criteria in that specific circumstance, EPA emphasized that Congress had mandated promulgation of criteria for certain toxic constituents through amendments to the Clean Water Act.  57 Fed. Reg. 60848.  EPA is operating under no such Congressional mandate in regard to numeric nutrient criteria.

**The August 18, 2009 Consent Decree**

20.     On or about August 18, 2009, EPA executed a consent decree committing EPA to propose numeric nutrient criteria for Florida fresh waters by January 14, 2010 and to finalize the freshwater criteria no later than October 15, 2010. ***Exhibit 4***. Under the Consent Decree, EPA must propose numeric nutrient criteria for Florida estuarine and marine waters by January 14, 2011 and must finalize those criteria by October 15, 2011.[3]

21.     Over the objection of several intervenors, the Court in the original citizen's suit approved entry of the consent decree. ***Exhibit 5***.

**EPA's Criteria Proposed January 14, 2010**

22.     On January 14, 2010, EPA Administrator Lisa Jackson signed EPA's rule proposing numeric nutrient criteria for Florida's fresh waters (lakes and streams). Notice of the proposed rule was published in the Federal Register on January 26, 2010. ***Exhibit 6***.

23.     On November 14, 2010, Administrator Jackson signed the final rule adopting numeric nutrient criteria for Florida's fresh waters (lakes and streams). ***Exhibit 7***. The final rule is effective 15 months after publication in the Federal Register, except for section 131.43(e), which is effective 60 days after publication in the Federal Register.

24.     EPA's promulgation of the Final Rule on November 14, 2010, is final agency action subject to challenge under the federal Administrative Procedures Act (APA). The January 14, 2009, necessity determination is a necessary preliminary step in the rulemaking process and therefore is amenable to challenge as a basis for holding that the final rule is invalid.

---

[3] On June 7, 2010, the parties to the Consent Decree filed a Joint Notice to the Court of Extension of Consent Decree Deadlines with the Court in the August 2008 citizen's suit. The Joint Notice extends the deadlines by which EPA must propose and finalize numeric nutrient criteria for Florida estuarine and marine waters to November 14, 2011 and August 15, 2012, respectively. The deadline for finalizing numeric nutrient criteria for South Florida canals is extended to August 15, 2012. The Joint Notice did not affect the October 15, 2010 deadline by which EPA was to finalize numeric nutrient criteria for all lakes and all remaining streams within the State; EPA moved for, and was granted, a 30 day extension through November 14, 2010 which is a Sunday. EPA's new deadline to finalize the freshwater criteria became Monday, November 15, 2010.

## COUNT I

## Necessity Determination

## Arbitrary and Capricious Standard of Review, 5 U.S.C. §§ 701-706

25.     Plaintiffs contest EPA's numeric nutrient criteria rule for Florida as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701 – 706 and specifically § 706(2)(A) which allows this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; paragraphs one (1) through twenty-four (24) are again alleged in this paragraph twenty-five (25) as if set out herein in full.

26.     Section 706 of the Administrative Procedure Act, addressing the scope of judicial review of final agency action, states in relevant part that "the reviewing court shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

27.     The final rule is invalid because the January 14, 2009 necessity determination is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In addition to the allegations as set out below, the January 14, 2009 necessity determination: A) was created as a litigation tool to implement a litigation strategy of inducing settlement; B) was developed to limit the potential precedential effect of the suit against Florida although nutrient enrichment of surface waters is not at all unique to Florida; C) was not based upon scientific water quality related factors within the scope of the Clean Water Act; D) was not a determination of necessity whereby the Assistant Administrator marshaled evidence to support the need for federal water quality standards in Florida; E) requires the Administrator to set statewide or regional numeric nutrient criteria for which there is no professionally accepted peer reviewed methodology for setting such criteria; F) sets deadlines for the development of statewide numeric

nutrient criteria which cannot be met because there is no professionally accepted peer reviewed methodology for developing such criteria; G) singles out the State of Florida and its regulated community notwithstanding that substantial nutrient pollution of surface waters from anthropogenic sources occurs in other states; H) singles out Florida and its regulated community notwithstanding that the State of Florida was in the process of developing its own numeric nutrient criteria under an EPA-approved plan; I) disregards Florida's 79 EPA approved Total Maximum Daily Load determinations developed under Florida's EPA approved Impaired Waters Rule, pursuant to which TMDLs are developed, as a change to Florida's water quality standards. J) arbitrarily deprived stakeholders of any meaningful public participation in the development of the criteria; and K) is contrary to the intent of Congress by ignoring the infrastructure of the CWA based on cooperative federalism.

28.      EPA's Final Rule ignored recent relevant recommendations from the Agency's Science Advisory Board (SAB) regarding the development of nutrient criteria.  The SAB emphasized the necessity to understand the causative link between nutrient levels and impairment.  See SAB Report at 4.  Such an understanding is required to ensure that "managing for particular nutrient levels will lead to desired outcomes."  *Id*.  In particular, the SAB stressed that, "[i]f the numeric criteria are not based upon well-established causative relationships [between nutrient levels and impairment], the scientific basis for the water quality standards will be seriously undermined." *Id*. at 6.  The SAB also highlighted the importance of using site-specific data so modeling results will be scientifically defensible: "It is possible to use these water quality models to describe exposure (in terms of ambient nutrient concentrations) but in the absence of empirical data, this would not be scientifically defensible."  *Id*. at 18.  There is no assurance that water quality criteria will protect designated uses in the absence of the consideration of site-specific

conditions.  See *id*. at 37.  EPA's Final Rule ignores these SAB recommendations: the rule establishes state-wide criteria that fail to account for local conditions, cause-and-effect relationships, and impairment threshold levels.

29.     EPA had committed in the Consent Decree to proposing statewide criteria for fresh waters across the entire State of Florida by January 14, 2010 but as of November 3, 2009, approximately 60 days from EPA's self-imposed deadline, EPA had not yet determined the methods to be used stating in a declaration filed in the pending citizen suit regarding the 1998 document that "EPA is evaluating considering a range of possible approaches and methodologies for developing nutrient criteria for Florida…."

## COUNT II

### Necessity Determination

### Final Agency Action in Excess of Authority, Short of Statutory Right, 5 U.S.C. §§ 701-706

30.     The final rule is invalid as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701-706 and specifically § 706(2)(C), because the necessity determination underlying those rules is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; paragraphs one (1) through twenty-four (24) are again alleged in this paragraph thirty (30) as if set out herein in full.

31.     The Assistant Administrator issued the January 14, 2009 necessity determination to settle the suit filed against EPA in August of 2008 (or give EPA a basis for seeking dismissal). *Exhibit 3.*

32.     A necessity determination under § 303(C)(4)(B) must be a science-based decision based upon a determination that water quality criteria authorized by, and within the scope of, the Clean Water Act are necessary to protect the designated uses of a State's surface waters.

33.     EPA itself has stated that, under § 303(C)(4)(B), the Administrator must marshal conclusive evidence that federally promulgated criteria are necessary for a State's surface waters before imposing federally generated criteria upon the State.  *See* 57 Fed. Reg. 60848, 60858.

34.     Nothing within the Clean Water Act grants EPA the authority to declare that a state needs federally promulgated surface water criteria as a means of inducing the settlement or dismissal of a lawsuit filed against the federal agency with the express purpose of limiting precedential impacts in other states.  In promulgating the January 14, 2009 necessity determination as a litigation strategy (***Exhibit 3***), EPA has exceeded its statutory authority under the Clean Water Act in violation of 5 U.S.C. § 706(2)(C).

## COUNT III

### Necessity Determination

### Failure to Observe Proper Procedures, 5 U.S.C. §§ 701-706

35.     The final rule is invalid as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701-706 and specifically § 706(2)(D) because the necessity determination underlying those rules was promulgated "without observance of procedure required by law" and if the necessity determination is deemed invalid, then the final rule was promulgated in a fatally defective manner; paragraphs one (1) through twenty-four (24) are again alleged in this paragraph thirty-five (35) as if set out herein in full.

36.     In response to a request for information and copies of public records under the federal Freedom of Information Act (FOIA), counsel for EPA responded in June of 2009 that <u>no record was established</u> [for the promulgation of the necessity determination] because the January 14, 2009 document was not final agency action subject to challenge under the federal APA.  As reflected in withheld item 554 at page 105 of the 150 page privilege log provided in response to

the FOIA request, an e-mail was circulated on January 13, 2009, the day before the letter was released, wherein EPA legal counsel were questioning whether the January 14, 2009 necessity determination was indeed final agency action—although the action had already been taken.

37.     The January 14, 2009 necessity determination was "without observance of procedure required by law" in that it was performed without the development of a proper record of decision.

38.     Additionally, the rule is invalid because the January 14, 2009 determination was "without observance of procedure required by law."  EPA failed to abide by the public notification and public consultation requirements of 40 C.F.R. 25.

## COUNT IV

### Instream Criteria

### Arbitrary and Capricious Standard, 5 U.S.C. §§ 701-706

39.     Plaintiff challenges EPA's final rule, 40 C.F.R. § 131.43(c)(2)(i), as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C. §§ 701 – 706 and specifically § 706(2)(A) which allows this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; paragraphs one (1) through twenty-four (24) are again alleged in this paragraph thirty-nine (39) as if set out herein in full.

40.     As conceded by EPA in the preamble to its proposed rule, EPA was unable to establish a cause-and-effect (or dose-response) relationship between the instream concentrations of nutrients, both total nitrogen (TN) and total phosphorus (TP), and an observable negative biological response when reviewing data from Florida streams.

41.    The failure to establish a cause-and-effect or dose-response relationship means that EPA cannot establish the instream concentration at which negative environmental impacts occur in Florida's freshwater streams i.e., EPA's rule lacks an adequate scientific basis.

42.    Notwithstanding its failure to establish a relationship between instream nutrient concentrations and environmental (primarily biological) impacts, EPA has promulgated numeric nutrient criteria for instream TP and TN using a reference water approach that is both facially invalid and invalid as applied.

43.    EPA reviewed TP and TN data from Florida streams considered to have "good biology" which, for EPA's purposes, means that the waters reviewed exceeded a score of 40 points applying Florida's Stream Condition Index (SCI) or waters selected as "benchmark waters" by the State of Florida.  Designation of a stream as a "benchmark water," also uses the SCI as a determining factor.

44.    EPA then prepared a frequency distribution (graph or plot of the data) looking at the frequency of occurrence of nutrient data (TP and TN data expressed as milligrams per liter or mg/l) from those waters with an SCI score exceeding 40 points and a limited number of the State's benchmark or reference waters.  EPA then arbitrarily drew a line at either the 75th percentile, i.e., the point on the graph of the data at which 75 percent of the data would lie to the left of the line under the curve, or the 90th percentile depending upon the location of the streams within the State.  EPA declared that TP or TN concentrations corresponding to the 75th or 90th percentile on the graph, depending upon the nutrient region, are the new federal instream nutrient criteria.

45.    EPA's reference water basis for its nutrient criterion is arbitrary and capricious for a number of reasons, including but not limited to:

A.      Arbitrarily selecting the 75th percentile means that 25 percent of the data from EPA's reference streams exceed the new criterion; similarly, choosing the 90th percentile means that 10% of the data from biologically healthy streams now exceeds the criterion.  As a result, under EPA's rule, a large proportion  of EPA's reference waters—the biologically healthy clean waters that EPA used to set its standards—by law are impaired and must be "restored" under the Clean Water Act Total Maximum Daily Load (TMDL) program under § 303(d) of the Act.

B.      EPA conceded that it could not establish a cause-and-effect or dose-response relationship between nutrient concentrations and biological response in streams.   EPA's reference water approach arbitrarily claimed that a relationship existed between good stream biology and nutrient concentrations without any evidence to support it.

C.      EPA's own Science Advisory Board (SAB) advised EPA that the failure to establish a cause-and-effect relationship could render EPA's attempt to set numeric endpoints for nutrients meaningless stating: "[w]ithout a mechanistic understanding and a clear causative link between nutrient levels and impairment, there is no assurance that managing for particular nutrient levels will lead to the desired outcome." Final Report, April 28, 2010.

46.     The reference water approach, as applied by EPA, is invalid for a number of reasons including but not limited to:

A.      Using an SCI score of 40 points, EPA filtered out tens of thousands of data points within Florida's STORET database down to 521 sampling locations for TN and 525 sampling sites for TP, with data restricted to a 6-year period of record (2004 – 2009); based on these limited data points a geometric mean of the TP and TN data were calculated for each site and the various sites were assigned to one of four nutrient regions.

B.      For most sites, EPA only had two data points over the six year period from which EPA calculated a mean (average) nutrient concentration; in some nutrient regions, from 45% to 59% of the site "geometric means," were based upon <u>a single measurement over the 6-year period of record</u>.  It is not possible to calculate a mean from a single measurement.

C.      One or two measurements over a 6-year period of record are meaningless for characterizing the nutrient regime of the water body.  This is especially true in Florida which experiences regularly occurring extreme high rainfall and drought cycles that result in great variation in concentrations.

D.      After proposing criteria using the approach set out in subparagraphs A through C above, EPA changed course in August of 2010 abandoning its SCI-approach and using nutrient data from the State's benchmark or reference waters but arbitrarily eliminating waters that EPA did not prefer notwithstanding the State's database establishing the waters as reference waters. EPA then reversed itself again, applying the SCI approach only to the phosphate rich West Central Nutrient Region (a/k/a the Florida Bone Valley) applying the 75th percentile but the applying the benchmark-approach using the 90th percentile to other parts of the State.

E.      Whether using the SCI-Approach or Benchmark Approach, neither establishes a cause-and-effect relationship between nutrient concentrations and instream biological harm and, but for EPA's own self-serving guidance from the late 1990s, and contrary to the April 2010 SAB report, these reference water approaches are not peer reviewed approved methods for establishing water quality criteria because neither method assures that if the number is met the Clean Water Act mandate of protecting designated uses will be met.

F.      Using a reference water approach is an admission by EPA that the agency cannot interpret Florida's narrative criterion into ecologically meaningful numeric endpoints

notwithstanding that the preamble to EPA's final rule claims to have done just that; EPA's assertion that it has, or can, interpret Florida's narrative nutrient criterion—for all streams across the state—using some variation of a reference water approach is false.

47.     EPA's methods for determining compliance with the instream criteria are also arbitrary; while EPA derived the criteria using an undefined "long-term geometric mean," it decided to assess compliance using an annual geometric mean, or a long-term arithmetic mean of geometric means.  The various statistical expressions are neither the same nor interchangeable.

## COUNT V

## Instream Criteria

## Final Agency Action in Excess of Authority, Short of Statutory Right, 5 U.S.C. §§ 701-706

48.     Plaintiff challenges EPA's final rule, 40 C.F.R. § 131.43(c)(2)(i), as final agency action as provided by the federal Administrative Procedure Act, 5, U.S.C., §§ 701-706 and specifically § 706(2)(C), which allows this Court to set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; paragraphs one (1) through twenty-four (24) and paragraphs thirty-nine (39) through forty-seven (47) are again alleged in this paragraph forty-eight (48) as if set out herein in full.

49.     EPA's numeric nutrient criteria for Florida streams are not protective of the designated uses for those streams and therefore beyond the scope of EPA's rulemaking authority in that:

A.     The criteria are not based upon a dose-response or cause-and-effect relationship and therefore there is no scientific basis to support EPA's assertion that maintaining a given instream concentration of TN or TP is necessary to protect the waterbody from negative impacts;

B.     The criteria are based upon a reference water approach that does not establish cause and effect.  EPA has established threshold principles that all water quality criteria should

meet.  See Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms and Their Use (USEPA 1985).  The purpose of water quality criteria is to protect aquatic organisms and their uses from unacceptable effects.  See *id*. at vi.  Proper criteria derivation requires the establishment of a cause-and-effect relationship to ensure that regulation of the pollutant is necessary and will produce the desired effect.  *Id.* at 15- 16, 21.  For materials that have a threshold effect (like nutrients), the threshold of unacceptable effect must be determined.  *Id*. at 8.  As applied by EPA, the criteria did not include sufficient nutrient data to properly characterize the reference waters and therefore could not be used to predict the biological reaction of unrelated surface waters to instream nutrient concentrations;

C.     As originally proposed, EPA's rule included downstream protective values (DPVs) for streams flowing to estuaries that effectively reduced the proposed instream protective values (IPVs) to a fraction of the IPV concentration; EPA deferred action on its estuarine DPVs but proceeded to finalize its instream criteria (IPVs).

D.     By asserting that the DPVs are necessary, EPA has conceded that the IPVs were not developed to be protective of downstream waters in violation of 40 CFR s. 131.10(b).  If the IPVs were developed consistent with federal law, there would be no need to propose the DPVs.  By withdrawing the DPVs, EPA has left standing (and has finalized), instream criteria that are not protective of the designated uses of the streams for which they have been set (using the reference water approach with insufficient data) or for downstream waters.

## Count VI

## Lakes Criteria

## Arbitrary and Capricious Standard, 5 U.S.C. §§ 701-706

50.     Plaintiff challenges EPA's final rule, 40 C.F.R. § 131.43(c)(1), as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701 − 706 and specifically § 706(2)(A) which allows this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; paragraphs one (1) through twenty-four (24) and paragraphs thirty-nine (39) through forty-seven (47) are again alleged in this paragraph fifty (50) as if set out herein in full.

51.     Many lakes within the Bone Valley region of Florida, are naturally high in TP because they are located in phosphorous rich soils and phosphate rock substrate.

52.     EPA's rule imposes total phosphorus criteria on naturally occurring and constructed lakes within Florida's Bone Valley that are lower than what is expected to occur naturally.

53.     Lakes with ambient TP concentrations greater than EPA's lakes criteria would be deemed impaired and would have to be "restored" under s. 303(d) of the Clean Water Act to meet nutrient targets that are not attainable and would never have occurred naturally.

54.     The Clean Water Act does not require, and EPA has no authority to mandate, criteria that are more stringent than naturally occurring background conditions.

## Count VII

## Downstream Values for Lakes, BATHTUB Model

## Arbitrary and Capricious Standard, 5 U.S.C. §§ 701-706

55.     Plaintiff challenges EPA's final rule, 40 C.F.R. § 131.43(c)(2)(ii), as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701 − 706 and specifically

§ 706(2)(A) which allows this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; paragraphs one (1) through twenty-four (24) and paragraphs thirty-nine (39) through forty-seven (47) are again alleged in this paragraph fifty-five (55) as if set out herein in full.

56.     EPA's rule adopts the BATHTUB nutrient loading model to establish additional numeric criteria that reduce instream criteria for those streams which flow into lakes.

57.     The BATHTUB model was developed for southeastern impounded waters and was not intended, nor is it applicable, to shallow subtropical Florida lakes.

58.     As with the DPVs for streams flowing into estuaries, EPA's determination that downstream protective values for lakes are needed is an admission that its instream criteria are insufficient to protect downstream waters as required by 40 CFR 131.10(b); if the instream criteria are protective of instream designated uses and downstream waters, there is no basis for establishing the downstream protective values for lakes.

59.     Consequently, EPA's application of the BATHTUB or any alternative model to establish downstream protective values for lakes is arbitrary, capricious and otherwise contrary to law.

60.     EPA's final rule requires that flows into a lake meet the TP and TN values for the lake at the point of entry.  Therefore, if a lake does not meet standards, the IPV for all streams in the watershed must be reduced even if they do not cause or contribute to the lake's failure to meet the required limits.  As a result, the IPVs for **all** influent streams would have to be reduced below the levels needed to protect the streams themselves.  This imposes an unreasonable and arbitrary requirement on the upstream components.

## Count VIII

### Nitrate-Nitrite Criterion for Springs

### Arbitrary and Capricious Standard, 5 U.S.C. §§ 701-706

61.     Plaintiff challenges EPA's final rule, 40 C.F.R. § 131.43(c)(3), as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701 – 706 and specifically § 706(2)(A) which allows this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; paragraphs one (1) through twenty-four (24) and paragraphs thirty-nine (39) through forty-seven (47) are again alleged in this paragraph sixty-one (61) as if set out herein in full.

62.     EPA has finalized a numeric criterion of 0.35 mg/l nitrate-nitrite which was originally developed by the Florida Department of Environmental Protection (DEP) for spring boils and spring vents; the State has not yet finalized the criterion.

63.     EPA did no studies or analyses to determine that 0.35 mg/l nitrate-nitrite was an appropriate criterion for all springs across the State of Florida.

64.     State studies presented in support of the criterion at public workshops indicated that nitrate-nitrite concentrations of 0.44 mg/l could occur in spring boils and vents without demonstrating negative biological response.

65.     EPA's finalization and application of the unadopted State criterion to all springs within the State of Florida is arbitrary, capricious and contrary to law.

**Count IX**

**Failure to Exclude Waters with Nutrient TMDLs from the Rule is Arbitrary and Capricious**

66.     Plaintiff challenges EPA's final rule as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701 – 706 and specifically § 706(2)(A) which allows this Court to set aside final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; paragraphs one (1) through twenty-four (24) are again alleged in this paragraph sixty-six (66) as if set out herein in full.

67.     EPA previously approved Florida's Impaired Waters Rule, Rule 62-303, Fla. Admin. Code, as a change to Florida's water quality standards.  EPA has also approved at least 79 Total Maximum Load Determinations (TMDLs) by Florida as the appropriate water quality standards for those waters.

68.     In the final rule, EPA fails to exempt waters with existing EPA-approved nutrient TMDLs from the rule.  Failure to recognize the already approved TMDLs is a change in EPA's position on the ability of those limits to meet the requirements of the CWA.  Nutrient TMDLs include numeric limits similar to that of water quality criteria in that both the TMDLs and the water quality criteria must protect the designated use of the applicable waters.  See 44 U.S.C. §§ 1313(c)-(d); 40 C.F.R. §§ 130.2(j) and 130.7   Such a change in position without adequate explanation and support in the record is arbitrary and capricious and an abuse of discretion.

**Count X**

**Failure to Fully Disclose the Rulemaking's Technical Basis, Regulatory Implications, and**

**Economic Impacts Constitutes a Failure to Observe Procedures Required by Law. 5 U.S.C.**

**§ 706(2)(D).**

69.     Plaintiff challenges EPA's final rule as final agency action as provided by the federal Administrative Procedure Act, 5 U.S.C., §§ 701 – 706 and specifically § 706(2)(D) which allows this Court to set aside final agency action made without observance to procedures required by law; paragraphs one (1) through twenty-four (24) are again alleged in this paragraph sixty-nine (69) as if set out herein in full.

70.     Throughout this rulemaking process, EPA has failed to disclose the rulemaking's technical basis, regulatory implications, and economic impacts.  Cf. 5 U.S.C. § 533(b).  EPA was not forthcoming with data, methods, analyses, or clear explanations of rule provisions.  EPA has not explained the Science Advisory Board's critical review of EPA's nutrient criteria derivation method.  EPA has incorrectly represented that this rule will have, at most, only indirect impacts on regulated entities in Florida.  EPA has consistently understated the economic implications of the rule on Florida.  Contrary to the requirements of the Administrative Procedure Act, EPA conducted this rulemaking in a manner that frustrated the public's right to effectively participate in the process.

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff as follows:

1.     Finding the November 15, 2010 Final Rule invalid because the January 14, 2009 necessity determination violates the federal Administrative Procedures Act in that it is: A)

arbitrary, capricious an abuse of discretion, or otherwise not in accordance with law; B) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, C) that the necessity determination and therefore the final rule were prepared without observance of procedure required by law;

2.    Finding 40 CFR §§ 131.43(c) (1), (2) and (3) to be final agency action in violation of the federal Administrative Procedures Act in that the rule provisions are: A) arbitrary, capricious an abuse of discretion, or otherwise not in accordance with law; B) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and or, C) prepared without observance of procedure required by law;

3.    Enjoining the Administrator and EPA from implementing the federal numeric nutrient criteria for Florida in the Final Rule, 40 CFR part 131.

4.    Grant any further relief this Court may deem just and proper.

Dated this 7th day of December, 2010.

BILL McCOLLUM
ATTORNEY GENERAL

*s/ Carol A. Forthman*
Carol A. Forthman
Florida Bar No. 307327
Florida Department of Agriculture
   and Consumer Services
407 South Calhoun Street
The Mayo Building, Rm. 520
Tallahassee, Florida  32399-0800
Telephone:  850/245-1000
Facsimile:  850/245-1001
forthmc@doacs.state.fl.us

*s/ Jonathan A. Glogau*
Jonathan A. Glogau
Chief, Complex Litigation
Fla. Bar No. 371823
PL-01, The Capitol
Tallahassee, FL 32399-1050
850-414-3300, ext. 4817
850-414-9650 (fax)
jon.glogau@myfloridalegal.com